UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal Action No. 15-10260-LTS |
| ) | |
| JUAN GONZALEZ-ARIAS ) | |
| a/k/a EDUARDO RAMIREZ, et al., ) | |
| ) | |
| Defendants. ) | |

ORDER ON MOTION TO SUPPRESS

September 15, 2016

SOROKIN, J.

Defendant Juan Gonzalez-Arias is charged with various offenses alleging he distributed heroin as part of a conspiracy. See Doc. 27. On June 24, 2016, Defendant filed a Motion to Suppress ("Motion") "all evidence seized from" 264 East Haverhill Street, Apartment 18, in Lawrence, Massachusetts, when authorities "executed a search warrant at approximately 12:00 a.m. on July 13, 2015." Doc. 135. Defendant argues that the affidavit in support of the warrant ("Affidavit") by DEA Special Agent Garth Hamelin did not establish probable cause "to believe that evidence would be found in the location searched." Doc. 136 at 7. For the reasons that follow, the Motion is DENIED.

I.   LEGAL STANDARD

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed – the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched – the so-called 'nexus' element." United States v. Dixon, 787

F.3d 55, 59 (1st Cir. 2015) (quoting United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999)). "With regard to the 'nexus' element, the task of a magistrate in determining whether probable cause exists is 'to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  Feliz, 182 F.3d at 86 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).  "Put differently, the application must give someone of reasonable caution reason to believe that evidence of a crime will be found at the place to be searched." United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005) (citation and internal quotation marks omitted); see also Feliz, 182 F.3d at 86 ("The probable cause standard does not demand showing that such a belief be correct or more likely true than false.") (citation and internal quotation marks omitted).  "The probable-cause nexus between enumerated evidence of the crime and the place can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide evidence of a crime." Ribeiro, 397 F.3d at 49 (citation, brackets, and internal quotation marks omitted).

A magistrate judge's determination that information in a search warrant affidavit establishes probable cause receives "considerable deference," such that a reviewing court will reverse the determination only if there was "no substantial basis for concluding that probable cause existed." Feliz, 182 F.3d at 86; Dixon, 787 F.3d at 58-59.

II.   AFFIDAVIT'S ALLEGATIONS

The Affidavit was submitted to Magistrate Judge David H. Hennessy on July 12, 2015. Doc. 151 at 51.  Based on the Affidavit's facts, Special Agent Hamelin stated he believed that Defendant used 264 East Haverhill Street, Apartment 18 ("the Target Location"), "not only as

his residence, but also to stash and prepare narcotics for sale." Id.  Judge Hennessy issued a warrant based on the Affidavit the same day.  Id. at 1.

The Affidavit alleges the following facts:  The Target Location was located on the third floor of a three-story brick apartment building.  Id. at 25.  In March 2014, DEA agents in Boston initiated an investigation into a drug-trafficking organization led by Defendant.  Id. at 27.

On October 22, 2014, agents saw Defendant leave the Target Location and then, about ten minutes later, arrive at a pre-designated location to sell heroin to an undercover agent.  Id. at 27-28.

On November 20, 2014, according to data from a global positioning system ("GPS") tracking device on Defendant's vehicle, Defendant left the Target Location and then, about 70 minutes later, arrived at the same pre-designated location to again sell heroin to the undercover agent.  Id. at 28-29.  Shortly thereafter, Defendant traveled back to the Target Location.  Id. at 29.

On March 7, 2015, agents, through an authorized wiretap, heard Defendant call a restaurant and state that he had ordered food to be delivered to East Haverhill Street.  Id. at 31.  Later, the restaurant called Defendant and informed him that the delivery person had arrived; Defendant said the delivery person should ring Apartment 18.  Id.

On March 27, 2015, investigators saw a co-conspirator of Defendant's park in the parking lot adjacent to the Target Location.  Id. at 32.  After Defendant made a call that Special Agent Hamelin believed was an order for drugs,[1] the co-conspirator left the Target Location carrying a green bag.  Id.

---

[1] Special Agent Hamelin interpreted certain statements by Defendant and the co-conspirators as a code that did not use the typical names for drugs or measurements.

On April 10, 2015, Defendant and a co-conspirator had a phone conversation in which, Special Agent Hamelin believed, Defendant explained that he was processing heroin for distribution. Id. at 34. According to agents who were monitoring a telephone pole camera outside the Target Location and according to the GPS device on Defendant's vehicle, Defendant was at the Target Location during the phone call. Id. Defendant told the co-conspirator to "give me five minutes," then two minutes later left the Target Location to meet the co-conspirator. Id. Immediately after meeting the co-conspirator at a nearby location, Defendant returned to the Target Location. Id. at 34-35.

On April 18, 2015, after telling a co-conspirator over the phone how much heroin he had to distribute – specifically, he said, "I perhaps have there about 200 to 300 pesos," meaning grams – agents saw Defendant leave the Target Location to meet the co-conspirator at a second location. Id. at 35. Agents at the second location saw Defendant arrive carrying a white plastic bag. Id. Shortly after the co-conspirator left the second location, the police stopped him, found 103 grams of heroin in his left front pocket, and arrested him. Id. at 36.

On June 9, 2015, Defendant and a co-conspirator agreed over the phone to meet so that Defendant could obtain a shipment of about ten kilograms of heroin. Id. at 38. Agents then saw Defendant leave the Target Location and travel to a residence in Lawrence, Massachusetts, then leave that residence with the co-conspirator. Id. In subsequent intercepted calls, Defendant told the co-conspirator that he had given the heroin to a different co-conspirator to test its quality. Id. According to Special Agent Hamelin, it "is likely that [Defendant] brought the heroin he received from [the first co-conspirator] back to the Target Location before" giving it to the second co-conspirator. Id.

From October 2014, when agents obtained authorization for the GPS device, until July 12, 2015, the date of the Affidavit, Defendant's vehicle had "been located daily and overnight, with few exceptions, in the parking lot of the Target Location." Id. at 50.  Moreover, from October 31, 2014, until July 12, 2015, Defendant was "seen daily in the parking lot near the Target Location." Id.

Special Agent Hamelin, based on his training and experience as well as observations made during the investigation, believed that Defendant, "like many drug traffickers, has used his residence in furtherance of his drug trafficking activities, and that, among other things, documentary and other evidence regarding those activities" would be found at the Target Location.  Id. at 46.

III.  DISCUSSION

Defendant does not dispute that the Affidavit established probable cause that he was involved in drug-conspiracy-related activity; nor could he, given the transactions with the undercover agent and the other observations by law enforcement.  Rather, Defendant argues that the Affidavit (1) did not sufficiently establish that he lived in Apartment 18, as opposed to one of the other apartments in the building; and (2) did not establish enough of a nexus between the alleged drug conspiracy and Apartment 18.[2]  As explained below, the Affidavit comfortably

---

[2] In three footnotes, Defendant suggests a third argument:  that Special Agent Hamelin omitted material information from the Affidavit, which presents a "potential" violation of Franks v. Delaware, 438 U.S. 154 (1978). Doc. 136 at 2 n.2; 3 n.3; 5 n.5.  However, Defendant does not elaborate upon this claim at all.  Certainly, Defendant does not make either of the "two substantial preliminary showings" necessary under the Franks doctrine to rebut the presumption that the Affidavit is valid.  United States v. McLellan, 792 F.3d 200, 208 (1st Cir. 2015).  Defendant does not specifically argue, much less show, that (1) the omissions were made "knowingly and intentionally or with reckless disregard for the truth," or (2) any omission was "necessary to the finding of probable cause." Id. (citing, inter alia, Franks, 438 U.S. at 155-56 (internal quotation marks omitted)).  On the contrary, the omitted facts Defendant mentions were clearly immaterial, and there is no reason to believe Special Agent Hamelin held any disregard for the truth.

established "a fair probability that contraband or evidence of a crime" would be found at the Target Location. Feliz, 183 F.3d at 86. At a minimum, there was a "substantial basis" for the Magistrate Judge's determination that the Affidavit established probable cause with respect to both commission and nexus. See id.; Dixon, 787 F.3d at 58-59.

Defendant argues that "[p]olice never adequately confirmed that [he] lived in" Apartment 18. Doc. 136 at 7. Defendant states he "was never observed inside" or entering Apartment 18, but "only seen entering the building with multiple dwelling units." Id. at 2; see also id. at 8 ("[A]lthough the police had a camera in the area of the target building, the view was entirely external."). According to Defendant, "[t]he only information that the Affidavit offers that [he] lived in [Apartment] 18 was his use of a cell phone from that unit to order take-out food delivery," which he argues was insufficient to establish that he lived there. Id. at 3 (citing Doc. 151 at 31).

These arguments are unavailing. Defendant obviously lived in the target building: he parked his car in the building's parking lot on a daily basis from October 2014 until July 12, 2015, and he was seen countless times entering and leaving the building. See generally Doc. 151 at 27-38, 50. In addition, Defendant was heard instructing a delivery person to ring Apartment 18. Id. at 31. Based on these facts, any person of reasonable caution would have ample reason to believe that Defendant lived in the Target Location. See Ribeiro, 397 F.3d at 48. The Magistrate Judge did not need proof positive that Defendant lived in Apartment 18 to issue the warrant, for the probable cause standard does not even demand a showing that a belief is "more likely true than false." Feliz, 182 F.3d at 86. At a minimum, the Magistrate Judge had a substantial basis for determining there was probable cause to believe Defendant lived in Apartment 18. See Dixon, 787 F.3d at 58-59.

Defendant also argues that, even if the Affidavit established that he lived in Apartment 18, it failed "to establish a nexus between the apartment and the defendant's illegal activities." Doc. 136 at 8. According to Defendant, "[t]he lapse of significant time" between his exit from the Target Location and his second meeting with the undercover agent "indicates stops prior to their meetings," likely to a "stash house." Id. at 8-9. Moreover, Defendant states that he "was never seen carrying any packages or containers indicative of narcotics storage" when leaving the target building. Id. at 10. Defendant also highlights that "[t]he one time [he] met [one of the co-conspirators] in the target building," after which the police searched the co-conspirator but found no drugs on him or in his car. Id. According to Defendant, this incident and the Affidavit as a whole illustrate that he did not keep drugs in his apartment, thereby eliminating any nexus.[3] See id. at 11.

Defendant neglects to mention that his *first* drug transaction with the undercover agent took place only about ten minutes after he left the Target Location. Doc. 151 at 27-28. Defendant also ignores that, on March 27, 2015, investigators saw a co-conspirator of Defendant's arrive at the Target Location and – after Defendant made a call that Special Agent Hamelin was an order for drugs – then leave with a green bag. Id. at 32. Defendant also ignores that once, shortly before leaving the Target Location, he had a phone conversation with a co-conspirator in which he apparently stated that he was processing heroin for distribution. Id. at

---

[3] Defendant also notes that, on April 18, 2015, he stated "I perhaps have there about 200 to 300 pesos." Doc. 136 at 5. Defendant later misquotes this statement as "I have 200 pesos *there*." Id. at 17 (emphasis in original). He then argues that the logical inference from the misquotation is that "he stores heroin elsewhere." Id. There is a significant difference between "there" and "there about" in this context. While "there" might lead the Court to infer that Defendant stored heroin elsewhere, "there about" likely meant that he was estimating the amount of heroin he had. See Merriam-Webster Online, http://www.merriam-webster.com/dictionary/thereabout. In any case, even assuming Defendant kept his heroin supply elsewhere, there may well have been other evidence of Defendant's alleged large-scale drug conspiracy in his home. See Ribeiro, 397 F.3d at 49 ("One can reasonably infer that . . . large-scale traffickers would need to keep detailed accounts, customer lists, and money in some safe yet accessible place, i.e., their homes.") (citation and internal quotation marks omitted).

7

34. Finally, Defendant fails to mention that, only about a month before the issuance of the warrant, he was heard speaking on the phone, while in the Target Location, about how to obtain an approximately ten-kilogram shipment of heroin.  Id. at 38.  Thus, there was ample reason to believe that Defendant conducted drug- and conspiracy-related activities from the Target Location, in satisfaction of the nexus element.[4]

The existence of a nexus in this case is further bolstered by the fact that the Target Location appeared to be Defendant's residence.  The First Circuit "has repeatedly found . . . that when a defendant sells drugs outside his home, it is reasonable to conclude that there is evidence of his drug dealing activity in the home, particularly when the defendant is observed leaving the home immediately prior to selling drugs."  United States v. Barnes, 492 F.3d 33, 37 (1st Cir. 2007) (citing numerous cases); see also supra n.3 (noting that, under Ribeiro, it is reasonable to assume there will be incriminating evidence in the residence of a large-scale trafficker such as Defendant); United States v. Woodbury, 511 F.3d 93, 98 (1st Cir. 2007) (stating that "direct evidence" tying a suspect's residence to a drug transaction is not necessary to find probable cause to believe "criminal objects are located" there) (citing Feliz, 182 F.3d at 88).[5]

In sum, the Affidavit offered sufficient evidence that Defendant (1) lived at the Target Location; (2) conducted drug-conspiracy-related activity from the Target Location; and (3) was a large-scale trafficker, who, according to federal case law and common sense, would likely have

---

[4] Each of the facts mentioned in this paragraph invalidates any suggestion by Defendant, see Doc. 136 at 8 n.7; 12, that the Affidavit relied on stale information.  Indeed, it is at least possible, if not likely, that *none* of the information in the Affidavit was stale.  See United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996) ("[I]t is common ground that drug conspiracies tend to be ongoing operations, rendering timely information that might, in other contexts, be regarded as stale.").

[5] In arguing for suppression, Defendant cites almost exclusively Massachusetts state case law.  See Doc. 136 at 10-16.  However, "federal law governs the admissibility of evidence in federal prosecutions."  United States v. Charles, 213 F.3d 10, 19 (1st Cir. 2000) (citations omitted).

some evidence of trafficking in his home.  The Affidavit therefore amply supported the commission and nexus elements of probable cause.  See Dixon, 787 F.3d at 59.

In the alternative, even assuming the Magistrate Judge did not have a substantial basis to issue the warrant, the Court finds that the officers who searched the Target Location acted in good faith on the warrant, and the warrant was not "so lacking in indicia of probable cause" that "no reasonably well trained officer should" have relied on it.  United States v. Leon, 468 U.S. 897, 923 (1984).  Thus, even if the warrant were invalid, the Court would deny the Motion.  Id.; see also Woodbury, 511 F.3d at 99.

Accordingly, Defendant's Motion to Suppress (Doc. 135) is DENIED.

                        SO ORDERED.

                        /s/ Leo T. Sorokin
                        Leo T. Sorokin
                        United States District Judge